[No. 27889-8-II.   Division Two.   December 13, 2002.]

GERALD RHOADES, ET AL., *Petitioners*, v. THE CITY OF BATTLE
GROUND, *Respondent*.

754

756

*Mark A. Erikson* (of *Mark A. Erikson, Attorney at Law, P.L.L.C.*), for petitioner.

*John E. Justice* (of *Law, Lyman, Daniel, Kamerrer & Bogdanovich*) and *Brian H. Wolfe* (of *Blair, Schaefer, Hutchison & Wolfe, L.L.P.*), for respondent.

HOUGHTON, J. — Exotic animal owners appeal a summary judgment order dismissing their various constitutional challenges to a city of Battle Ground ordinance that prohibits ownership of such animals within city limits. We affirm.

## FACTS

Gerald and Heidi Rhoades owned one African serval,[1] one caiman,[2] and two cougars when, in the summer of 2000, the city of Battle Ground (City) passed an ordinance (Ordi-

---

[1] A serval is a long-legged wild cat, *Felis serval*, of Africa.

[2] A caiman is a tropical American crocodilian resembling the alligator.

nance) making exotic animal ownership unlawful.[3] Under the Ordinance, it is unlawful "for any person to bring into the city, or to possess or maintain within the city, any exotic animal as defined in Section 6.10.020(7)." Clerk's Papers (CP) at 143 (Battle Ground Municipal Code (BGMC) 6.10.130). The Ordinance defined exotic animal as "any animal which, when in its wild state, or due to its size, habits, natural propensities, training or instinct, presents a danger or potential danger to human beings and is capable of inflicting serious physical harm upon human beings, and includes inherently dangerous mammals and reptiles." CP at 134 (BGMC 6.10.020(7)). "Inherently dangerous mammals" are "any live member of the *canidae, felidae,* or *ursidae families,* including hybrids thereof, which, due to their inherent nature, may be considered dangerous to humans . . . ."[4] CP at 134 (BGMC 6.10.020(7)(a)). "Inherently dangerous reptiles" are "any live member of the class *reptilia*" that is venomous, "rear fanged," or a member of the order *Crocodilia* (including crocodiles, alligators, and caiman) over two feet long. CP at 135 (BGMC 6.10.020(7)(b)(i), (ii), (iii)).

The Ordinance also prospectively exempts animals kept on later annexed land:

> It is further provided that any animal that is properly being maintained on a parcel of property that is annexed into the City of Battle Ground shall be deemed to be a non-conforming use so long as it is compatible with the existing land use while the property was outside the City of Battle Ground. Other than the licensing of dogs and dangerous dogs, the provisions of this

---

[3] For the purpose of this action, the parties stipulated that the Rhoadeses' four animals met the Ordinance's definition of exotic animals.

[4] In the *canidae* family, the Ordinance includes "wolf, coyote, jackal, hyena, fox, and all their hybrids." CP at 135. In the *felidae* family, the Ordinance includes "any member of the cat family weighing over fifteen (15) pounds not customarily domesticated by man, or any hybrids thereof, but not including domestic cats (*Felis catus*)." CP at 135. And in the *ursidae* family, the Ordinance includes "any member of the bear family, or any hybrids thereof." CP at 135.

chapter shall not apply until such time as the pre-existing use of the land becomes a conforming use.

CP at 143 (BGMC 6.10.170).

The Rhoadeses challenged the Ordinance immediately, but the municipal court dismissed the case as unripe. Then in August 2002, the City issued the Rhoadeses an initial notice of violation of BGMC 6.10.130 and BGMC 6.10.075.[5] The notice warned that a criminal citation could follow if they did not remove the animals from the City within 30 days.

The Rhoadeses appealed the notice of violation to municipal court, which found that they violated the Ordinance. They appealed to the superior court, and both sides moved for summary judgment. The court granted the City's motion.

The Rhoadeses appeal.

## ANALYSIS

### Standard of Review

Summary judgment is proper only when the pleadings, affidavits, and depositions on file demonstrate that there is no issue of material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c). We consider all facts and reasonable inferences in a light most favorable to the nonmoving party, and we review de novo all questions of law. *Wilson Court Ltd. P'ship v. Tony Maroni's, Inc.*, 134 Wn.2d 692, 698, 952 P.2d 590 (1998). Here, the parties stipulated to the facts.

### Equal Protection

The Rhoadeses first contend that the Ordinance violates their right to equal protection under the constitution. They assert that the Ordinance treats those who keep exotic pets within the City differently from those who do so on later

---

[5] BGMC 6.10.075 prohibits the keeping of "large animals" (those over 100 pounds under BGMC 6.10.020(12)) on property less than one-half acre in size.

annexed property. They further assert that the City treats residents who keep exotic pets differently from those who keep dangerous dogs.

■■ "Under the equal protection clause, persons similarly situated with respect to the law . . . must receive similar treatment." *State v. Blilie*, 132 Wn.2d 484, 493, 939 P.2d 691 (1997). "The first step in conducting any equal protection analysis is determining the appropriate standard of review." *Tunstall v. Bergeson*, 141 Wn.2d 201, 225, 5 P.3d 691 (2000), *cert. denied*, 532 U.S. 920 (2001). Here, the Rhoadeses acknowledge that they do not allege a violation of a fundamental right or inclusion in a suspect class; we agree and, therefore, rational basis review applies. *See Tunstall*, 141 Wn.2d at 226.

■ Under the rational basis test, we determine whether (1) the governmental action applies alike to all members within the designated class; (2) there are reasonable grounds to distinguish between those within and those without the class; and (3) the classification has a rational relationship to the legislative purpose. *Convention Ctr. Coalition v. City of Seattle*, 107 Wn.2d 370, 378-79, 730 P.2d 636 (1986); *Thurston County Rental Owners Ass'n v. Thurston County*, 85 Wn. App. 171, 185, 931 P.2d 208, *review denied*, 132 Wn.2d 1010 (1997).

We will not rule that an ordinance is invalid under a rational basis review unless it rests on grounds "wholly irrelevant to the achievement of a legitimate state objective." *Nielsen v. Wash. State Bar Ass'n*, 90 Wn.2d 818, 820, 585 P.2d 1191 (1978) (citing *McGowan v. Maryland*, 366 U.S. 420, 425-26, 81 S. Ct. 1101, 6 L. Ed. 2d 393 (1961)). Concerning the third prong, "a classification must be 'purely arbitrary' to overcome the strong presumption of constitutionality." *Thurston County Rental Owners*, 85 Wn. App. at 186.

### Current Versus Future City Residents

■■ The Rhoadeses first define the classes at issue as those exotic animal owners who keep their animals in the

city and those who currently keep their animals outside of the city but may continue to do so if annexed into the city.

This issue is not yet ripe and thus not subject to an equal protection analysis. The city has no authority over property outside of the city, even if it might one day annex the property into the city. Therefore, the provision that if and when such property is annexed in the owners may continue to keep their animals has no current effect because the city cannot regulate property outside of its limits.

A justiciable controversy must exist before we will review a declaratory judgment action challenging the constitutionality of an ordinance. *First United Methodist Church v. Hearing Exam'r*, 129 Wn.2d 238, 245, 916 P.2d 374 (1996). Such a controversy exists where there is (1) an actual, present, and existing dispute, or the mature seeds of one, as distinguished from a possible, dormant, hypothetical, speculative, or moot disagreement, (2) that is between parties having genuine and opposing interests, (3) which involves interests that must be direct and substantial, rather than potential, theoretical, abstract, or academic, and (4) a judicial determination of these interests will be final and conclusive. *First United Methodist*, 129 Wn.2d at 245. In other words, a case is ripe if the issues raised are primarily legal, do not require further factual development, and the challenged action is final. *First Covenant Church v. City of Seattle*, 114 Wn.2d 392, 400, 787 P.2d 1352 (1990), *adhered to on remand*, 120 Wn.2d 203, 840 P.2d 174 (1992).

"Equal protection of the laws under [both our] state and federal constitutions requires that persons similarly situated with respect to the legitimate purpose of the law receive like treatment." *Harmon v. McNutt*, 91 Wn.2d 126, 130, 587 P.2d 537 (1978). The Rhoadeses present their injury as their loss of their exotic animals. But for equal protection purposes, the only relevant injury is disparate treatment under the Ordinance. That has not yet happened. Therefore, under the ripeness analysis above, the first factor is dispositive, for there is no actual, present, and existing dispute (nor the mature seeds of one) because there

is no disparate treatment. *See First United Methodist*, 129 Wn.2d at 245.

## *Exotic Animals versus Dangerous Dogs*

The Rhoadeses also argue that the Ordinance violates their equal protection rights because it treats city residents who keep dangerous dogs differently from those who keep exotic animals.

Under the city's animal control ordinances, owners may keep dangerous dogs, provided that the owners obtain a license. Additionally, owners of dangerous dogs must keep them confined in a secure area with warnings, post a bond or carry sufficient homeowner's insurance, and keep the dog muzzled and leashed when out in public. *See* BGMC 6.10.110, .120 (CP at 141, 142).

The Rhoadeses claim that the Ordinance creates two classes of animal owners, those who own dangerous dogs and those who own exotic animals. They argue that the Ordinance treats the members of these classes differently by permitting the licensing and maintenance of dangerous dogs but prohibiting the licensing and maintenance of exotic animals.

Claiming this differentiation is unjustified, the Rhoadeses quote our Supreme Court, which recently noted that "a vicious dog and a wild animal are equally dangerous." *Frobig v. Gordon*, 124 Wn.2d 732, 737, 881 P.2d 226 (1994). The Rhoadeses' argument is misplaced.

The *Frobig* case involved a negligence action against a landlord after a tenant's tiger mauled a tenant's invitee. *Frobig*, 124 Wn.2d at 734-35. In declining to create a separate rule regarding landlord liability for wild animals, the court explained

> We do not believe that a separate rule of law for cases involving wild animal attacks is necessary. Courts have long recognized that a vicious dog and a wild animal are equally dangerous, as the following observation from *Laverone v. Mangianti*, 41 Cal. 138 (1871) illustrates. In referring to the

defendants' insistence that a person may lawfully keep a ferocious dog, the chief justice wrote, "That position may be conceded, and it may also be conceded that he has the same right to keep a tiger. The danger to mankind and the injury, if any is suffered, comes from the same source—the ferocity of the animal." *Laverone*, at 139. Vicious dogs and tigers are both dangerous, and if a tenant bears sole responsibility for the consequences of owning a dog, then he or she should be solely responsible for the consequences of owning a tiger.

*Frobig*, 124 Wn.2d at 737.

The Rhoadeses appear to argue that a local legislative body cannot draw a different conclusion from our Supreme Court in areas of public safety and the exercise of the local government's police powers. We disagree.

■ ■ Our state constitution simply requires that the local exercise of police powers not conflict with the general laws: "Any county, city, town or township may make and enforce within its limits all such local police, sanitary and other regulations as are not in conflict with general laws." WASH. CONST. art. XI, § 11. *See also Lenci v. City of Seattle*, 63 Wn.2d 664, 667, 388 P.2d 926 (1964) (explaining that the police powers a city holds under article XI, section 11 of the Washington Constitution " 'requires no legislative sanction for its exercise so long as the subject-matter is local, and the regulation reasonable and consistent with the general laws' ") (quoting *Detamore v. Hindley*, 83 Wash. 322, 326-27, 145 P. 462 (1915)).

The Rhoadeses assert that the Ordinance "seems to hinge on the unpredictability of animals." Appellants' Br. at 14. They then discuss the steps they have taken to ensure the predictability of their animals, ultimately concluding that there is no legitimate state objective in distinguishing between dangerous dogs and exotic animals. Again, we disagree.

■ There is a legitimate interest in treating exotic animals and dangerous dogs differently. Here, the city council determined that exotic animals were more of a threat to the health and safety of its population. The city

explains that its decision is bolstered by the opinion of a veterinarian who averred that in some ways, wild animals are more dangerous when caged than when encountered in the wild. A determination that exotic animals are more dangerous than dogs adjudged "dangerous" is sufficient—on rational basis review—to justify the disparate treatment between these classes of pet owners.

■ Last, the city rightly points out that a legislative body need not approach every problem the same way; thus, it may treat the danger presented by dangerous dogs differently from the danger presented by exotic animals. *See* Respondent's Br. at 24 (" ' "[I]t must be remembered that equal protection does not require a state to attack every aspect of a problem. Rather, the legislature is free to approach a problem piecemeal and learn from experience." ' ") (quoting *Simpson v. State*, 26 Wn. App. 687, 694, 615 P.2d 1297 (quoting *Yakima County Deputy Sheriff's Ass'n v. Bd. of Comm'rs*, 92 Wn.2d 831, 836, 601 P.2d 936 (1979)), *review denied*, 94 Wn.2d 1022 (1980)).

The Rhoadeses' arguments based on equal protection fail.

## Substantive Due Process

The Rhoadeses next contend that the Ordinance violates their substantive due process rights. They assert that there is no legitimate state purpose in enacting the Ordinance to protect the city's citizens and that the Ordinance is unduly burdensome.

■ To determine whether an ordinance violates due process, " '1) there must be a public problem or "evil," 2) the regulation must tend to solve this problem, and 3) the regulation must not be "unduly oppressive" upon the person regulated.' " *Presbytery of Seattle v. King County*, 114 Wn.2d 320, 330-31, 787 P.2d 907 (quoting William B. Stoebuck, *San Diego Gas: Problems, Pitfalls and a Better Way*, 25 J. URB. & CONTEMP. L. 3, 20 (1983)), *cert. denied*, 498 U.S. 911 (1990). The third prong "will usually be the

difficult and determinative one." *Presbytery*, 114 Wn.2d at 331.

## Legitimate State Purpose

The Rhoadeses attempt to show that there is no legitimate state purpose in the Ordinance by stating, "there is no evidence that the residents of Battle Ground need 'protection' from exotic animals. There is no finding of any 'public problem or evil' relating to the possession of exotic animals which this ordinance tends to solve." Appellants' Br. at 17. Again, the Rhoadeses' argument is misplaced.

The city has a legitimate interest in protecting its citizens from exotic animals. That exotic animals live in the city is enough evidence that its residents need protection from them, considering the city's supportable view that these animals are dangerous.

## Reasonably Necessary Means

The Rhoadeses next argue that maintaining exotic animals on later annexed property as a nonconforming use shows that the Ordinance fails under the second prong because the Ordinance does nothing to safeguard city residents from the animals on later annexed property.

But allowing exotic animals to continue to live on later annexed property as a nonconforming use at most implies that perhaps the exotic animals are not so dangerous as the Ordinance otherwise implies. But there is no doubt that if the properly perceived governmental interest is to protect residents from exotic animals, then the ban on their possession within the city limits—regardless of any leniency toward their possession on future annexed property— serves that purpose.

## Unduly Burdensome

The Rhoadeses further argue that the Ordinance is unduly burdensome because it could be more narrowly

tailored, for example, to require licensing of exotic animals instead of a total ban. In examining whether an ordinance is unduly burdensome, we consider the nature of the harm sought to be avoided, the availability of less drastic measures, and the economic loss suffered by the property owner. *Presbytery*, 114 Wn.2d at 331.

Here, the city's stated purposes for the Ordinance—safety of both residents and the animals themselves—would likely not be served by a less drastic ordinance. Regulation of the animals still leaves the possibility of escape and does nothing to protect the animals from the harm of captivity. Balancing the factors, the Rhoadeses have not met their burden of proving that the Ordinance is unduly burdensome.[6]

## Procedural Due Process

The Rhoadeses further contend that under the Ordinance, their animals can be impounded and destroyed without notice, thus violating their rights to procedural due process.

Procedural due process constrains governmental decision making that deprives individuals of liberty or property interests within the meaning of the Due Process Clause. *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). Due process is a flexible concept; the exact contours are determined by the particular situation. *Mathews*, 424 U.S. at 334. But an essential principle of due process is the right to notice and a meaningful opportunity to be heard. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S. Ct. 652, 94 L. Ed. 865 (1950)).

A meaningful opportunity to be heard means " 'at a meaningful time and in a meaningful manner.' " *Mathews*,

---

[6] The Rhoadeses do not make a specific economic harm argument, instead they declare that their economic loss "is the cost of relocation or loss of beloved personal property." Appellants' Reply Br. at 15.

424 U.S. at 333 (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S. Ct. 1187, 14 L. Ed. 2d 62 (1965)). The United States Supreme Court "consistently has held that some form of hearing is required *before* an individual is finally deprived of a property interest." *Mathews,* 424 U.S. at 333 (emphasis added).

Determining what process is due in a given situation generally requires consideration of (1) the private interest involved, (2) the risk that the current procedures will erroneously deprive a party of that interest, and (3) the governmental interest involved. *Mathews,* 424 U.S. at 335; *Spence v. Kaminski,* 103 Wn. App. 325, 335, 12 P.3d 1030 (2000).

Here, first, the private interest involved is the owners' interest in keeping their pets. This is greater than a mere economic interest, for pets are not fungible. So the private interest at stake is great. Taking the third consideration next, the governmental interest is the burden of keeping these exotic animals in impound while awaiting a hearing.

The Rhoadeses claim that BGMC 6.10.320-.350 of the Ordinance provide that exotic animals may be impounded and destroyed. As the city points out, the Ordinance first provides for a notice of violation, which in this case allowed 30 days for the owners to abate the problem. Those who receive a notification may then appeal the notice by filing an appeal with Battle Ground Municipal Court.

The Rhoadeses cite no Ordinance language to support their claim that animals may be impounded and destroyed without process. Instead, they cite only generally to the three ordinances that deal with enforcement (BGMC 6.10.320) (CP at 153-54), penalties (BGMC 6.10.330) (CP at 155), and impoundment (BGMC 6.10.350) (CP at 155). The Rhoadeses claim that the Ordinance does not provide a procedure for owners of exotic animals to appeal or to redeem their property. We disagree. Under BGMC 6.10.390, parties may appeal to municipal court, and enforcement is stayed pending the appeal:

"(1) Any person appealing a determination under this title shall file in writing with the Battle Ground Court system and within thirty (30) days, or the period otherwise provided in this title, of the notice of adverse action, a written appeal containing:

" . . . .

"(4) Enforcement of any violation notice issued under this chapter shall be stayed during the pendency of an appeal, except the impoundment of an animal which is vicious or cruelly treated."

CP at 157-58 (quoting BGMC 6.10.390).

The Rhoadeses claim that "[w]ere it not for a Superior Court order in the case,[7] the appellants would have been unable to bring this argument to a court of law. Rights of appeal should be included within legislation, and should not be left for the courts to create." Appellants' Br. at 27 (footnote omitted). We disagree that the legislation lacks a right of appeal. The first sentence of BGMC 6.10.390(1) identifies the right to appeal ("[a]ny person appealing a determination under this title shall file in writing with the Battle Ground Court system . . . .").[8] CP at 157. The Rhoadeses' argument fails.

## Overbreadth

The Rhoadeses also argue that the Ordinance is "overbroad and facially invalid because it infringes upon a substantial amount of property rights." Appellants' Br. at 29.

---

[7] As noted above, the superior court judge ruled that the Rhoadeses had a right to appeal any future violation, based on the City's acknowledgment of such right on the record, and ruled that enforcement of the Ordinance would be stayed during the pendency of an appeal.

[8] Later, in their equitable estoppel analysis, the Rhoadeses state that under BGMC 6.10.390(7) (CP at 158), the Ordinance prohibits appeal for all violations involving "unlicensed pets." And because exotic animals cannot be licensed, they claim this means they have no right to appeal. We disagree. That subsection provides that a person "may not appeal those notices of violation issued for unlicensed pets." BGMC 6.10.390(7) (CP at 158). The Rhoadeses were not cited for a violation issued for unlicensed pets; they were cited for keeping large and exotic animals in the city.

▮▮▮▮ The overbreadth doctrine involves substantive due process and asks whether a statute not only prohibits unprotected conduct, but also reaches constitutionally protected conduct. *Blondheim v. State*, 84 Wn.2d 874, 878, 529 P.2d 1096 (1975). Unless a statute's overbreadth is alleged to infringe on First Amendment protected activity, the challenger cannot rely on hypothetical conduct to demonstrate that a statute is unconstitutional. *State v. Lundquist*, 60 Wn.2d 397, 401, 374 P.2d 246 (1962) (explaining that "[a] litigant who challenges the constitutionality of an ordinance must claim infringement of an interest peculiar and personal to himself, as distinguished from a cause of dissatisfaction with the general framework of the ordinance").

Moreover, a statute that regulates conduct is facially overbroad in violation of the First Amendment only if it prohibits a substantial amount of constitutionally protected conduct. *City of Seattle v. Huff*, 111 Wn.2d 923, 925, 767 P.2d 572 (1989) (quoting *City of Houston v. Hill*, 482 U.S. 451, 458, 107 S. Ct. 2502, 96 L. Ed. 2d 398 (1987)). *See also Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973) (explaining that "the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep").

The Rhoadeses argue that, because the Ordinance has criminal penalties, we must use "particular scrutiny" when analyzing its facial validity. They provide no authority supporting this assertion. Furthermore, they do not allege a First Amendment right; therefore, they may not attack the statute facially, but only as applied.

Our Supreme Court has already held that a pet ownership regulation does not reach a substantial amount of constitutionally protected conduct. *Am. Dog Owners Ass'n v. City of Yakima*, 113 Wn.2d 213, 217, 777 P.2d 1046 (1989) (" 'property in dogs is of an imperfect or qualified nature' ") (quoting *Sentell v. New Orleans & Carrollton R.R.*, 166 U.S. 698, 701, 17 S. Ct. 693, 41 L. Ed. 1169 (1897)). In *American*

*Dog Owners*, 113 Wn.2d at 217, the court upheld the constitutionality of a Yakima ordinance that banned pit bulls, holding that

> [t]he Yakima ordinance is constitutional even though some inoffensive pit bulls might be banned. Overbreadth is only a problem when it reaches a substantial amount of constitutionally protected conduct. Dogs are subject to police power and may be destroyed or regulated to protect citizens. Thus, property in dogs is of an imperfect or qualified nature, and a harmless or inoffensive American Pit Bull Terrier may be banned in order to abate the threat presented by other American Pit Bull Terriers.

(Citations omitted.)

Ultimately, the Rhoadeses disagree that all exotic animals are dangerous: "All animals which fall under this definition [of exotic animals] are banned, regardless of actual propensities or disposition." Appellants' Br. at 29. But this does not make the Ordinance overbroad. The city is free under its police powers to make such generalizations.

### Equitable Estoppel

The Rhoadeses next contend that the city should be equitably estopped from enforcing the Ordinance against them. They maintain that they relied on the city's failure to respond to their direct inquiries about keeping exotic animals and/or on the city code enforcement officers' telling them that they complied with the law.

Equitable estoppel requires clear, cogent, and convincing proof of three elements: (1) an admission, statement, or act inconsistent with a party's later claim, (2) action by another party in reasonable reliance on that admission, statement, or act, and (3) injury to that party when a court allows the first party to contradict or repudiate its admission, statement, or act. *Robinson v. City of Seattle*, 119 Wn.2d 34, 82, 830 P.2d 318, *cert. denied*, 506 U.S. 1028 (1992). Additionally, the party asserting the doctrine must be free from fault in the transaction at issue.

*Mut. of Enumclaw Ins. Co. v. Cox*, 110 Wn.2d 643, 651, 757 P.2d 499 (1988).

Equitable estoppel against government entities is disfavored; thus, the party asserting equitable estoppel must also show that application of the doctrine is necessary to prevent a manifest injustice and that the exercise of government functions will not be impaired. *Kramarevcky v. Dep't of Soc. & Health Servs.*, 122 Wn.2d 738, 743, 863 P.2d 535 (1993).

Gerald Rhoades testified that both city police and code enforcement officials visited his home on separate occasions to inspect the cougars' containment area. They found the Rhoadeses in compliance with local laws.

Here, the government action the Rhoadeses now seek to estop is enforcement of a new ordinance. The Rhoadeses point to no admission, statement, or act on which they relied that implied that the city would never outlaw the possession of exotic animals. At most, the city implied—with its silence in response to the Rhoadeses' inquiry about keeping exotic animals and its later inspection—that the Rhoadeses complied with the laws in effect at the time of the inquiry and inspection. The city did not assure the Rhoadeses that the law would not change later. Therefore, the first prong is not met, so we do not reach the remaining two.[9]

## Takings

Finally, the Rhoadeses contend that enforcing the Ordinance against them effects a taking without compensation. ▆▆▆▆▆▆ Before the United States Supreme Court case, *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992), Washington

---

[9] The Rhoadeses also argue that a manifest injustice would occur here because the City "had a duty to respond to appellants' direct inquiries regarding their right to possess exotic animals. Despite its duty to speak, respondent was silent." Appellants' Br. at 36. The Rhoadeses provide no support for their claim that the City had a duty to respond.

applied the *Presbytery* analysis from *Presbytery*, 114 Wn.2d at 329-30, which involved two threshold questions to determine if additional takings analysis is necessary. *See Guimont v. Clarke*, 121 Wn.2d 586, 594, 854 P.2d 1 (1993), *cert. denied*, 510 U.S. 1176 (1994).

The first question is whether the challenged regulation safeguards the public interest in the health, safety, environment, or fiscal integrity of an area, or whether the regulation " 'seeks less to prevent a harm than to impose on those regulated the requirement of providing an affirmative public benefit.' " *Guimont*, 121 Wn.2d at 594-95 (quoting *Robinson v. City of Seattle*, 119 Wn.2d 34, 49, 830 P.2d 318, *cert. denied*, 506 U.S. 1028 (1992)). "The second threshold question is whether the challenged regulation destroys one or more of the fundamental attributes of property ownership[, including] the right to possess, to exclude others, or to dispose of property." *Guimont*, 121 Wn.2d at 595. But after *Lucas*, which focused on the second question, our Supreme Court changed the order of the threshold analysis:

> Hereafter, the court will begin the threshold inquiry by asking whether the regulation denies the owner a fundamental attribute of ownership. Any analysis of "physical invasions" or "total takings", including all facial challenges to land use regulations, will be analyzed at the outset under the first prong of the threshold test. If the plaintiff proves a "physical invasion" or "total taking" occurred, the plaintiff need not proceed with the remainder of the *Presbytery* analysis.

*Guimont*, 121 Wn.2d at 601.

The Rhoadeses argue that the Ordinance works "a per se or categorical taking under *Guimont* and *Schreiner Farms*[, *Inc. v. Smitch*, 87 Wn. App. 27, 940 P.2d 274 (1997)], because there is no application of the ordinance which would not result in the deprivation." Appellants' Br. at 39. But as the city points out, the Rhoadeses cannot allege a total taking because the Ordinance does not require the destruction of the animals or otherwise affect them except to require that they no longer be kept in the city. Unlike the real property that is generally subject of a takings analysis,

here the property is mobile. There can be no total takings when there is a way to save the property.

Next, then, under *Guimont*, we look at the second threshold question:

[I]f the regulation does not implicate fundamental attributes of ownership, the court will proceed to the next threshold inquiry, analyzing whether the regulation goes beyond preventing a public harm to producing a public benefit. If the purpose of the regulation is to produce a benefit, the court will then proceed with balancing the legitimacy of the State's interest with the adverse economic impact on the landowner.

*Guimont*, 121 Wn.2d at 601. Here, it is apparent that the Ordinance's aim is more to prevent a public harm—namely, injury or death by wild animal and protection of the exotic animals—than to produce any public benefit. Therefore, the takings analysis ends with the threshold questions.

Because the Rhoadeses cannot establish that their animals would be taken at all, considering they can move them outside the city, and because they cannot establish that, if taken, they would be taken for public use, as opposed to under the city's police powers, their takings claim fails.

### Attorney Fees

■ The Rhoadeses seek attorney fees under 42 U.S.C. § 1988(b) (providing for fees at the court's discretion in any action to enforce a provision of 42 U.S.C. § 1983, among others). As we have held that the Rhoadeses are not the prevailing party, we do not award attorney fees.

Affirmed.

SEINFELD and ARMSTRONG, JJ., concur.

Review denied at 149 Wn.2d 1028 (2003).