# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RED LION HOTELS FRANCHISING,
INC.,
          *Plaintiff-counter-defendant-*
                        *Appellee,*

                v.

MAK, LLC; MAHMOUD KARIMI,
AKA Mike Karimi; JANE DOE
KARIMI, individually and as a
marital community,
          *Defendants-counter-claimants-*
                        *Appellants.*

No. 10-35465

D.C. No.
2:08-cv-00262-EFS

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Edward F. Shea, District Judge, Presiding

Argued and Submitted
June 7, 2011—Seattle, Washington

Filed December 7, 2011

Before: Stephen Reinhardt, William A. Fletcher, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge William A. Fletcher;
Partial Concurrence and Partial Dissent by Judge Rawlinson

20795

## COUNSEL

Douglas Clayton Berry, GRAHAM & DUNN, PC, Seattle, Washington, for the appellee.

Michael Karimi; LAW OFFICE OF MICHAEL KARIMI, Modesto, California, Michael A. Maurer, LUKINS & ANNIS, P.S., Spokane, Washington, for the appellants.

**OPINION**

W. FLETCHER, Circuit Judge:

This litigation arises out of a franchise agreement between West Coast Hotels, Inc., and Mahmoud ("Mike") Karimi. The successor in interest to West Coast Hotels is Red Lion Hotels Franchising, Inc. ("Red Lion"). West Coast Hotels was, and Red Lion is, incorporated in Washington State with their headquarters in Spokane. Karimi and his hotel management company MAK, LLC (collectively, "Karimi") operated a Red Lion franchise in Modesto, California. Red Lion terminated the franchise and sued Karimi for breach of contract. Karimi counterclaimed, asserting state-law claims, including a claim based on the "franchisee bill of rights" of the Washington Franchise Investment Protection Act ("FIPA").

The district court granted summary judgment to Red Lion on Karimi's counterclaim under FIPA's bill of rights on the ground that FIPA does not apply extraterritorially. After a bench trial, the court held for Red Lion on its contract claim.

The primary question before us is whether a non-Washington franchisee may assert a claim against a Washington franchisor under FIPA's bill of rights. For the reasons explained in this opinion, we conclude that an out-of-state franchisee may assert such a claim against an in-state franchisor.

## I. Background

Mike Karimi has worked in the hotel industry since the 1980s. He owns a hotel management company, MAK, LLC, and operates several hotels through MAK.

In 2004, the Khatri brothers, friends of Karimi's, asked him to take over the operation of a hotel they owned in Modesto, California. Karimi was concerned about doing so because the

hotel was in poor condition — only 40 out of 186 guest rooms were usable — and needed significant renovations. Nonetheless, Karimi assumed the former operator's 99-year lease on December 1, 2004. Shortly thereafter, Karimi negotiated a franchise agreement with West Coast Hotels. For convenience, we will refer to West Coast Hotels, and to its successor in interest Red Lion, simply as Red Lion. Karimi asked for and received certain non-standard concessions in the franchise agreement. The franchise term was shortened to five years; the royalty fee for the first year of operations was reduced; and Karimi was given the option to terminate the agreement in the first year without having to pay liquidated damages.

The franchise agreement contained several sections relating to hotel quality and improvements. One section provided that

> [Red Lion] may from time to time require you to modernize, rehabilitate and/or upgrade the Hotel's fixtures, equipment, furnishings, furniture, signs, computer hardware and software and related equipment, supplies and other items to meet the then current standards and specifications specified in the Manual. . . . [Y]ou will make all these changes at your sole cost and expense. . . . We may make limited exceptions to some of those standards based on local conditions or special circumstances but we are not required to do so.

Red Lion reserved the right to change its Manual, a written collection of standards and requirements for franchises, at any time. The agreement required Karimi to bear the costs of complying with any new standards. The agreement also gave Red Lion the right to inspect the hotel at any time to determine whether it complied with standards set forth in the agreement and the Manual.

The franchise agreement also contained provisions relating to termination of the franchise. Section 14(a) gave Red Lion

the power to terminate the agreement if the franchisee failed to cure an "Event of Default" within thirty days after notice. That section provided:

> An "Event of Default" will occur if you fail to satisfy or comply with any of the obligations, requirements, conditions, or terms set forth in . . . this Agreement, the Manual . . . , or any attachment to this Agreement . . . . An "Event of Default" will also occur if you make any misrepresentations to us, whether in entering into this Agreement, or in the performance of your obligations to us.

Section 14(c) provided that if Red Lion terminated the agreement under Section 14(a), Red Lion would receive liquidated damages.

Finally, the agreement contained a choice-of-law provision in the event of litigation. Section 16(b) provided:

> [T]his Agreement, all relations between us, and any and all disputes between us, whether sounding in contract, tort, or otherwise, are to be exclusively construed in accordance with and/or governed by (as applicable) the laws of the State of Washington without recourse to Washington (or any other) choice of law or conflicts of law principles. . . . Nothing in this section is intended to invoke the application of any franchise, business opportunity, antitrust, "implied covenant," unfair competition, fiduciary or any other doctrine of law of the State of Washington or any other state which would not otherwise apply absent this Paragraph 16.b.

After the franchise agreement became effective on February 1, 2005, Karimi began renovating the hotel. Among other things, he purchased new bedding, furniture, wallpaper, pedestal sinks, and air-conditioning units, and replaced the exte-

rior brick face with stucco. Karimi testified at trial that he spent around $1.5 million on the renovations.

In early 2005, Red Lion began a concerted effort to improve the quality of its hotels. A central part of the effort was the creation of new "brand standards," which were to apply to all hotels in the chain. The new brand standards were based on AAA's rating system, which awards hotels between one and five diamonds. Red Lion's standards were based on AAA's three-diamond standard. The new standards were announced to franchise owners at a meeting in January 2007. Franchise owners were told that they would receive a Property Improvement Plan, or PIP, that contained individualized lists of required improvements for each hotel.

Karimi was unable to attend the January 2007 meeting because he was hospitalized, but he was told in a February 20, 2007 letter from Red Lion that he would be given a PIP that would have to be completed by December 31, 2007. At some point in early 2007, Michael Castro, then the Director of Brand Services at Red Lion, met with Karimi at the Red Lion Modesto to prepare the PIP for the hotel. Castro sent the completed PIP to Karimi on May 15, 2007. The PIP contained more than 100 required improvements. Karimi refused to sign the PIP because of one requirement. He had installed pedestal sinks as part of his improvements to the hotel; the PIP required, instead, granite vanities with undermounted sinks. Karimi testified at trial that he had discussed the sink issue with Castro, and that Castro had granted him a waiver for pedestal sinks. Castro testified that he could not recall granting such a waiver. Karimi testified that he asked for a revised PIP, but that none was ever sent.

Under the original PIP sent by Castro, MAK was required to receive written confirmation from Red Lion that all furniture, fixtures, and equipment met or exceeded brand standards. The PIP also required written approval from Red Lion of any "changes or revisions to [the] scope of work or design

elements." Finally, any extensions of more than 90 days after the December 31, 2007 deadline required written approval from Red Lion.

In July 2007, John Taffin, an executive vice president at Red Lion, toured the Red Lion Modesto to assess progress on the PIP. In September 2007, Taffin sent Karimi a letter reminding him of the December deadline. On October 10, 2007, a third-party contractor conducted an annual inspection of Karimi's franchise, as specified in Red Lion's brand standards manual. Karimi received a grade of eighty-five percent, one point less than the passing grade of eighty-six percent. In late November 2007, Todd Cooley, who had succeeded Mike Castro as the director of brand services, inspected the Red Lion Modesto. He testified at trial that the hotel looked "old and tired," and that the renovations were "substantially incomplete."

From November 2007 until June 2008, there was no contact between Karimi and Red Lion about either the PIP or the December 31, 2007 deadline. In early June 2008, Mark Fielding, an accountant at Red Lion, stayed in the Modesto hotel while attending a wedding. Cooley had given Fielding a brand standards manual and had asked him to "look around" the hotel, although Fielding had no experience evaluating compliance with brand standards. Fielding testified that he observed that several fixtures in the bathroom did not comply with brand standards and that the hotel looked "old, tired, worn out, kind of well used." He reported to Cooley that the hotel "needed some TLC."

On June 17, 2008, two weeks after Fielding's stay at the hotel, Red Lion sent Karimi a "Notice of Default and Termination." Taffin testified that the Notice of Default was prompted by a chain-wide decision to deal "aggressive[ly]" with franchises that had not completed the PIPs by the December 31, 2007 deadline. The Notice of Default included an updated PIP containing a list of improvements that were

required to cure the default and avoid termination. The notice stated:

> You must immediately demonstrate to us that MAK, LLC is making the necessary improvements to the Hotel in compliance with the PIP, and has a reasonable expectation of completing all required improvements in a time frame that is acceptable to us.
>
> **IF MAK, LLC DEFAULTS ARE NOT TIMELY CURED TO RED LION'S SATISFAC-TION, MAK, LCC'S Franchise License Agreement shall be deemed to have been terminated without further notice to MAK, LLC 30 days from the effective date of this Notice.**

(Emphasis in original.)

Karimi replied on June 19, stating that all but four items from the updated PIP had been completed, and that the remaining items would be completed by August 2008. Karimi also wrote that "should that scheduled completion time be unacceptable to Red Lion Hotels we are prepared to complete our entire PIP within 30 days from the effective date of [Red Lion's] notice. Since we have no guidance as to what would be an acceptable time frame to Red Lion Hotels, I trust that if our current scheduled completion date is unacceptable in the judgment of Red Lion Hotels, the fact of that judgment will be communicated to me without delay."

Red Lion did not send a letter in response to Karimi's June 19 letter. Instead, Cooley personally visited the hotel on July 9. In an inspection that lasted about ten minutes, Cooley determined that the improvements that Karimi said had been completed were, in fact, "substantially incomplete" and "the things that Mr. Karimi had implied . . . [weren't] accurate." Cooley took several photographs during his inspection. At

trial, the parties vigorously disputed whether the photographs were actually from July 2008 rather than from Cooley's November 2007 visit. Lori Knoll, the Red Lion Modesto's manager, and Michel Cockrum, who did hotel maintenance, testified that the photographs could not have been taken in July 2008, because they depicted features of the hotel that had been changed by July 2008. However, Gurdial Dhatt, Red Lion's director of Information Technology, testified that metadata in the electronic files showed that the pictures were indeed taken on July 9, 2008, and Karimi's expert agreed that the metadata on those pictures did not appear to have been altered.

After Cooley's July 2008 inspection, Red Lion decided that Karimi's letter was "not an accurate portrayal of what was happening at the property." On July 30, 2008, Red Lion sent Karimi a letter terminating his franchise agreement on the ground that "the improvements were not consistently applied to the entire property as represented in [Karimi's] letter."

Red Lion then sued MAK, Karimi, and Karimi's wife in federal district court, asserting breach of the franchise agreement and its accompanying personal guarantees, and seeking liquidated damages. Defendants counterclaimed for violations of Washington's Franchise Investment Protection Act ("FIPA"), Washington's Consumer Protection Act ("CPA"), and breach of the franchise agreement.

Red Lion moved for summary judgment on Karimi's FIPA and CPA counterclaims. The district court granted summary judgment on the FIPA claim, holding that a California company operating a franchise in California could not invoke FIPA against Red Lion because "the overall statutory scheme evinces the legislature's intent to confine FIPA's reach to franchises operating 'in this state' [i.e., Washington]." Because Karimi's CPA claim was predicated on his FIPA claim, the court also granted summary judgment on the CPA claim.

After a bench trial on the remaining claims, the district court found that Karimi had not complied with Red Lion's brand standards or the PIP, and that he had not been granted waivers that would excuse his noncompliance. The district court credited Taffin, Cooley, and Castro's testimony, and found that Cooley's photographs had been taken during his July 2008 hotel inspection. The court further found that Karimi's June 19, 2008 letter had misrepresented the state of the improvements to the hotel. The court held that Karimi had failed to comply with the franchise agreement and that Red Lion was justified in terminating the agreement. The court did not specifically address Karimi's affirmative defense that Red Lion was equitably estopped from terminating the franchise agreement. The court entered judgment in favor of Red Lion and awarded damages and attorney's fees to Red Lion.

Karimi timely appealed. In his appeal, he argues that (1) FIPA's "bill of rights" applies to his franchise, even though it is located outside Washington State, (2) Red Lion was equitably estopped from terminating the franchise agreement, and (3) entry of judgment against his wife was improper because she was not a party to the franchise agreement or its accompanying personal guarantee.

## II.   Standard of Review

We review a grant of summary judgment *de novo*. We must determine, viewing the evidence in the light most favorable to the non-moving party, whether the district court correctly applied the relevant substantive law and whether there are any genuine issues of material fact. *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 514 (9th Cir. 2010).

We review a district court's findings of fact for clear error. *OneBeacon Ins. Co. v. Haas Indus., Inc.*, 634 F.3d 1092, 1096 (9th Cir. 2011). A finding of fact is clearly erroneous "if it is (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Seller*

*Agency Council, Inc. v. Kennedy Ctr. for Real Estate Educ., Inc.*, 621 F.3d 981, 986 (9th Cir. 2010). (internal quotation marks and citation omitted). The court's conclusions of law are reviewed *de novo*. *OneBeacon Ins. Co.*, 634 F.3d at 1096.

We review a district court's rejection of an equitable estoppel defense for abuse of discretion. *Kingman Reef Atoll Invs., LLC v. United States*, 541 F.3d 1189, 1195 (9th Cir. 2008).

### III.　Discussion

### A.　FIPA Claim

Under the choice-of-law provision in the franchise agreement, Washington law applies to this dispute "without recourse to Washington (or any other) choice of law or conflicts of law principles." We construe the provision to mean that we should apply Washington law only insofar as that law, according to its own terms, would be applicable.

**[1]** The question before us is whether Washington's Franchise Investment Protection Act ("FIPA") applies to MAK, a non-Washington franchisee in its relationship with Red Lion, a Washington franchisor. FIPA was enacted "to curb franchisor sales abuses and unfair competitive practices." *Corporate Res., Inc. v. Eagle Hardware & Garden, Inc.*, 62 P.3d 544, 546 (Wash. Ct. App. 2003). FIPA deals mainly with registration and disclosure requirements, but it also contains a "franchisee bill of rights," which is intended to "ameliorate[ ] the non-negotiable nature of the franchisor-franchisee relationship." *East Wind Express, Inc. v. Airborne Freight Corp.*, 974 P.2d 369, 372 (Wash. Ct. App. 1999); WASH. REV. CODE § 19.100.180. Karimi alleges that Red Lion violated provisions of FIPA's bill of rights. FIPA does not specify a remedy for a violation of the bill of rights, but a franchisee may bring an action under Washington's Consumer Protection Act based on a FIPA violation. *Id.* § 19.86.020 (Consumer Protection Act); *see also Nelson v. Nat'l Fund Raising Consultants, Inc.*,

842 P.2d 473, 478 (Wash. 1992) ("The Legislature has provided [that] violations of the Franchise Investment Protection Act are per se unfair trade practices under the Consumer Protection Act.").

**[2]** FIPA's bill of rights does not contain—indeed, has never contained—language limiting its application to the relation between a franchisor and franchisee "in this state." The bill of rights provides:

> Relation between franchisor and franchisee — Rights and prohibitions.
>
> Without limiting the other provisions of this chapter, the following specific rights and prohibitions shall govern the relation between the franchisor or subfranchisor and the franchisees:
>
> > (1) The parties shall deal with each other in good faith.
> >
> > (2) For the purposes of this chapter and without limiting its general application, it shall be an unfair or deceptive act or practice or an unfair method of competition and therefore unlawful and a violation of this chapter for any person to:
> >
> > > (a-j) [listing prohibited acts, practices, and unfair methods of competition]

WASH. REV. CODE § 19.100.180.

**[3]** By contrast, several of FIPA's provisions contain an explicit statement that they apply to actions "in this state," with the clear implication that they apply *only* "in this state." These provisions are as follows, with emphasis added throughout. The sale, or offer of sale, of a franchise in the

state must be registered in the state. WASH. REV. CODE § 19.100.020 ("It is unlawful for any franchisor or subfranchisor to sell or offer to sell any franchise *in this state* unless the offer of the franchise has been registered . . ."). Advertisements published in the state for sale of a franchise that is subject to FIPA's registration requirement must be filed with the state director of financial institutions. *Id.* § 19.100.100 ("No person shall publish *in this state* any advertisements offering a franchise subject to the registration requirements of this law unless a true copy of the advertisement has been filed in the office of the director . . . ."). No advertisement concerning a franchise subject to FIPA's registration requirement may be published in the state after the director has found it contains a false or misleading statement. *Id.* § 19.100.110 ("No person shall publish *in this state* any advertisement concerning a franchise subject to the registration requirements of this chapter after the director finds that the advertisement contains any statements that are false or misleading . . . ."). Any franchise broker selling or offering to sell a franchise in the state must register with the state. *Id.* § 19.100.140 ("It is unlawful for any franchise broker to offer to sell or sell a franchise *in this state* unless the franchise broker is registered under this chapter."). Untrue statements of material fact or the employment of any fraudulent device, scheme, or artifice, in connection with any offer or sale of a franchise in the state are forbidden. *Id.* § 19.100.170 ("It is unlawful for any person in connection with the offer, sale, or purchase of any franchise or subfranchise *in this state* directly or indirectly: (1) To make any untrue statement of material fact in any application, notice, or report filed with the director under this law . . . . (3) To employ any device, scheme, or artifice to defraud.").

In 1991, the Washington legislature amended FIPA to provide a definition of the phrase "in this state" contained in the statute. The legislature did so largely based on a law review article written some years earlier by Professor Donald Chisum of the University of Washington Law School, who had pointed out that the meaning of "in this state" was unclear.

*See* Donald S. Chisum, *State Regulation of Franchising: The Washington Experience*, 48 WASH. L. REV. 291, 337-38 (1973). Professor Chisum recommended that Washington adopt a definition comparable to the definition contained in California's Franchise Investment Law. *Id.* The Washington legislature amended FIPA to include a definition similar to that which Professor Chisum had recommended. 1991 Wash. Legis. Serv. Ch. 226 (West).

By its terms, the definition of "in this state" provided by the 1991 amendments applies only to § 19.100.020. *See* WASH. REV. CODE § 19.100.020(2) ("For the purposes of this section, an offer to sell a franchise is made in this state when: (a) The offer is directed by the offeror into this state from within or outside this state and is received where it is directed, (b) the offer originates from this state and violates the franchise or business opportunity law of the state or foreign jurisdiction into which it is directed, (c) the offeree is a resident of this state, or (d) the franchise business that is the subject of the offer is to be located or operated, wholly or partly, in this state."); *id.* § 19.100.020(3) ("For the purpose of this section, a sale of any franchise is made in this state when: (a) An offer to sell is accepted in this state, (b) an offer originating from this state is accepted and violates the franchise or business opportunity law of the state or foreign jurisdiction in which it is accepted, (c) the purchaser of the franchise is a resident of this state, or (d) the franchise business that is the subject of the sale is to be located or operated, wholly or partly, in this state.").

The district court recognized that § 19.100.180, the FIPA provision at issue here, does not contain the phrase "in this state" or any other a territorial limitation. It nonetheless concluded that the "overall statutory scheme," as well as the 1991 amendments prompted by Professor Chisum's recommendation, "evince[ ] the legislature's intent to confine FIPA's reach to franchises operating 'in this state.' " In support of its conclusion, the district court cited the provisions of FIPA that do

contain territorial limitations. We disagree with the court's conclusion.

In recommending that a definition of the phrase "in this state" be added to § 19.100.020, Professor Chisum did not suggest that all of FIPA was territorially limited. On the contrary, he distinguished between the sale-related provisions of FIPA, which were modeled after a California law, and the franchisee bill of rights, which he called "unique" to Washington. *Chisum, State Regulation of Franchising*, 48 WASH. L. REV. at 370. As to the latter, he wrote that "The Act does not indicate the territorial coverage of [the franchisee bill of rights]." *Id.* at 341. Chisum did not recommend that the legislature add a territorial limitation to the franchisee bill of rights. He recommended only that the legislature define the limitation where it already existed in FIPA. The Washington legislature did no more than what Professor Chisum recommended.

FIPA's bill of rights applies to the "relation between the franchisor or subfranchisor and the franchisees." WASH. REV. CODE § 10.100.180. "Franchisor" is defined in FIPA as "a person who grants a franchise to another person." *Id.* § 19.100.010(8). "Franchisee" is defined as "a person to whom a franchise is offered or granted." *Id.* § 19.100.010(7). A "franchise" is defined as "[a]n agreement, express or implied, oral or written, by which: (i) A person is granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan prescribed or suggested in substantial part by the grantor or its affiliate; (ii) The operation of the business is substantially associated with a trademark, service mark, trade name, advertising, or other commercial symbol designating, owned by, or licensed by the grantor or its affiliate; and (iii) The person pays, agrees to pay, or is required to pay, directly or indirectly, a franchise fee." *Id.* § 19.100.010(4).

**[4]** As a matter of general principle, "[i]f a state law does not have limitations on its geographical scope, courts will

apply it to a contract governed by that state's law, even if parts of the contract are performed outside of the state." *Gravquick A/S v. Trimble Navigation Int'l, Ltd.*, 323 F.3d 1219, 1223 (9th Cir. 2003). The fact that FIPA's provisions relating to sales of franchises contain a territorial limitation does not lead us to conclude that FIPA's bill of rights is similarly limited. Indeed, the inclusion of explicit territorial limitations in the sale-related provision, and the failure to include such a limitation in the bill of rights, suggests the opposite conclusion. Under ordinary rules of statutory construction, we presume that the Washington legislature made a deliberate choice to impose territorial limitations on some, but not all, of FIPA's provisions. "[W]here [the legislature] includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that [the legislature] acts intentionally and purposely in the disparate inclusion or exclusion." *Kucana v. Holder*, 130 S. Ct. 827, 838 (2010) (internal quotation marks and citation omitted); *see also In re Detention of D.F.F.*, 183 P.3d 302, 306 (Wash. App. 2008) ("When a statute or rule provides for specifically enumerated exceptions, we presume that the absence of other exceptions is intentional.").

The district court relied on *Taylor v. 1-800-Got-Junk?, LLC*, 632 F. Supp. 2d 1048 (W.D. Wash. 2009), in reaching its conclusion that FIPA does not protect Karimi. In *Taylor*, plaintiff franchisees were residents of Oregon who owned and operated a franchise in Oregon. Defendant franchisor was a Delaware corporation with headquarters in Vancouver, British Columbia, Canada. The franchise agreement provided for the application of Washington law. *Id.* at 1049. After the franchisor terminated the franchise agreement, plaintiffs sued, alleging fraud. *Id.* at 1050. The franchisor argued that plaintiffs had waived their FIPA claims in a previous settlement. The plaintiffs, in response, pointed to FIPA's anti-waiver provision, WASH. REV. CODE § 19.100.220, which invalidates certain settlements of FIPA claims. *Id.* at 1051. *Taylor* thus

turned on whether FIPA's anti-waiver provision applied. *Id.* at 1051.

The *Taylor* court concluded that the presence of territorial limitations in the sale-related provisions of FIPA, combined with the 1991 amendments, means that FIPA does not apply to a franchise agreement in which both franchisor and franchisee are located outside Washington, and in which the plaintiffs' claims are based on events that occurred outside Washington. *Id.* at 1052, 1054. The court concluded that the settlement was valid and that plaintiffs had therefore waived their claims. *Id.* at 1054-55.

To the degree that the district court's opinion in *Taylor* can be read to hold that *all* provisions of FIPA are limited by the explicit territorial limitations in its sale-related provisions, we disagree with that reading. But it is clear that the *Taylor* court reached the right result on the facts of the case. Plaintiffs' underlying FIPA claim was for fraud in the sale of the franchise, and FIPA's fraud provision contains an explicit territorial limitation. *Id.* at 1050; WASH. REV. CODE § 19.100.170. Further, the dispute had no connection to Washington other than the choice-of-law and choice-of-forum clause in the franchise agreement. Neither the franchisor nor the franchisee was a Washington citizen or resident; the franchise was located outside Washington; the alleged fraud on which the suit was based occurred outside Washington; and the settlement agreement was reached outside Washington. Under these circumstances, the district court in *Taylor* was clearly correct in concluding that the Washington legislature did not intend FIPA to apply, even though the anti-waiver provision, § 19.100.220, did not contain an explicit territorial limitation.

However, we conclude that FIPA's bill of rights does apply to the case before us. In his 1973 article, Professor Chisum discussed the likely application of FIPA's bill of rights to the case in which a franchise or franchisee is located in Washington. Chisum at 341-42. His view was that FIPA's bill of rights

should apply to a franchise located in Washington, "especially" if the franchisee, as well as the franchise, are located in Washington. *Id.* at 341. The reason is obvious: The Washington legislature wished to protect Washington franchises and franchisees from unfair practices by out-of-state franchisors.

**[5]** Professor Chisum did not discuss the case in which an out-of-state franchise or franchisee seeks protection against a franchisor located in Washington. Despite this lack of discussion it is easy to see why the Washington legislature might have wanted to apply FIPA's bill of rights to all franchises and franchisees of Washington franchisors. For example, the legislature might have wanted to reassure potential out-of-state franchisees that they will be fairly treated by, and thereby encourage them to do business with, Washington franchisors.

Professor Chisum noted that Washington's FIPA was modeled in part on California's Franchise Investment Law, and his recommendation that FIPA be amended to contain a definition of "in this state" was based on a desire to conform Washington to California law. *Id.* at 335, 337-38. In *Gravquick*, we construed California's Equipment Dealers Act (a subspecies of California franchise law) to protect a non-California dealer against the unfair practices of a California dealer. *Gravquick A/S v. Thimble Navigation Int'l Ltd.*, 323 F.3d 1219, 1223 (9th Cir. 2003) If *Gravquick*'s interpretation of California's Equipment Dealer's Act is applied to Washington's FIPA bill of rights, an out-of-state franchise and franchisee are protected against practices of a Washington franchisor that are illegal under FIPA's bill of rights.

**[6]** We conclude the best interpretation of FIPA's bill of rights is the same as our interpretation of California's analogous Equipment Dealers Act. In the case now before us, the franchisor is incorporated in Washington and has its headquarters in Washington, and the franchise agreement provides for the application of Washington law. We hold that FIPA's

bill of rights applies to this dispute even though the franchise is located outside Washington.

**[7]** Red Lion argues that even if the FIPA's bill of rights applies to the franchise agreement, Karimi's only remedy is a claim under the CPA, and only Washington residents can bring CPA claims. At the time of the briefing in this case, the Washington Supreme Court had recently held that, in the context of the case before it, the CPA was limited to claims brought by Washington residents. *Schnall v. AT&T Wireless Servs., Inc.*, 225 P.3d 929, 938-39 (Wash. 2010). However, the Washington Supreme Court has since withdrawn that portion of the opinion. *Schnall v. AT&T Wireless Servs., Inc.*, 171 Wash. 2d 260, ___ P.3d ___ (Wash. 2011). The territorial reach of the CPA is thus an open question. We agree with Red Lion that the CPA provides the remedy for violation of FIPA's bill of rights. We remand to the district court to consider the merits of Karimi's FIPA counterclaim under FIPA's bill of rights and to determine whether Karimi is entitled to a remedy under the CPA.

## B.   Equitable Estoppel

Karimi argues, independent of any defense under FIPA's bill of rights, that Red Lion is equitably estopped under Washington law from terminating the franchise agreement. Red Lion argues under Washington law that it is not equitably estopped. Karimi points to Red Lion's June 17 letter requiring him to complete the PIP "in a time frame that is acceptable to us." Karimi notes that he wrote back immediately to Red Lion with a proposal to finish the work by August and with a request that Red Lion tell him whether his proposed schedule was acceptable. He offered in his letter to complete the PIP within 30 days if necessary. Rather than respond directly to the letter, Red Lion terminated the agreement on July 30, 2008.

Under Washington law, equitable estoppel requires (1) a statement or act inconsistent with the claim afterwards

asserted; (2) an action by the other party on the faith of that statement or act; and (3) an injury to the other party if the claimant is allowed to contradict or repudiate his earlier statement or act. *Liebergesell v. Evans*, 613 P.2d 1170, 1175 (Wash. 1980). A party claiming estoppel must "be free from fault in the transaction at issue," *Rhoades v. City of Battle Ground*, 63 P.3d 142, 151 (Wash. Ct. App. 2002), and "must have proceeded in good faith and with clean hands," *Mut. of Enumclaw Ins. Co. v. Cox*, 757 P.2d 499, 503 (Wash. 1988) (internal quotation marks and citation omitted). "A person may not base a claim of estoppel on conduct . . . induced by his own conduct, concealment, or representations, especially when fraudulent." *Id.* (internal citation marks and quotation omitted).

**[8]** Red Lion terminated the franchise agreement based on its conclusion that Karimi had misrepresented conditions in the hotel in his June 19 letter. The district court specifically credited the Red Lion managers' testimony and found that the pictures Cooley took in July 2008 accurately depicted the state of the hotel. The court found that Karimi's description of his progress in the June 19 letter was "not accurate," "that Mr. Cooley was correct in his assertions that [the PIP items] were not carried out, that there were misrepresentations and that, indeed, the Red Lion was justified in terminating the franchise." Karimi has not challenged those factual findings. Thus, Karimi was not "free from fault" in the transaction. *See Rhoades*, 63 P.3d at 151. On the contrary, according to Red Lion managers' credible testimony, Karimi's misrepresentations led directly to the decision to terminate the franchise agreement. Karimi therefore cannot succeed on an equitable estoppel defense. *Mut. of Enumclaw Ins. Co.*, 757 P.2d at 503.

## C. Judgment Against Karimi's Wife

Karimi contends on appeal that the district court entered judgment against his wife improperly, given that she was

never a party to any agreement with Red Lion. Karimi did not raise this argument in the district court.

Judgment was entered against Karimi's wife, labeled Jane Doe Karimi in the judgment, "individually and as a marital community." WASH. REV. CODE § 26.16.190 provides:

> For all injuries committed by a married person or domestic partner, there shall be no recovery against the separate property of the other spouse or other domestic partner except in cases where there would be joint responsibility if the marriage or the state registered domestic partnership did not exist.

[9] It appears that Karimi's wife was not a party to any agreement with Red Lion. We leave it to the district court on remand to determine if there is any reason, procedural or substantive, why judgment should be entered against her, and, if appropriate, to amend the judgment.

## Conclusion

Because FIPA's bill of rights applies to the franchise agreement at issue in this case, we remand to the district court to consider Karimi's FIPA counterclaim and to determine the availability of a remedy under the CPA. We agree with the district court's conclusion that Red Lion is not equitably estopped from terminating the franchise agreement. We remand for consideration by the district court of the entry of judgment against Karimi's wife. Costs on appeal to Appellants.

**REVERSED IN PART, AFFIRMED IN PART, AND REMANDED.**

RAWLINSON, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's conclusion that the franchisee may not rely upon the doctrine of equitable estoppel to avoid termination of the franchise agreement. However, I do not join the decision to "leave it [to] the district court on remand to determine if there is any reason judgment should be entered against [the franchisee's spouse] . . ." Because this issue was not raised in the district court, it was not properly considered on appeal. *See State of Ariz. v. Components, Inc.*, 66 F.3d 213, 217 (9th Cir. 1995) (explaining that we do not reach issues not raised in the district court). Because the issue was not raised in district court, we should not address it at all. *See id.*

I also dissent from the majority's holding that Washington's Franchise Investment Protection Act may be applied to the California franchise at issue in this case.

I start my analysis with the general understanding that a state legislature does not act with intent to affect matters outside the borders of its state. *See Grennan v. Crowley-Marine Svcs., Inc.*, 116 P.3d 1024, 1029 (Wash. App. 2005) (discussing the presumption against extraterritoriality). A state legislature's primary concern, understandably, is for the citizens the state representatives were elected to represent. Indeed, a bedrock principle of our legal system is that each state has an overriding interest in protecting the citizens of that state from harm, and a much lesser interest in protecting citizens of other states from harm. *See* Donald S. Chisum, *State Regulation of Franchising: The Washington Experience*, 48 *Wash. L. Rev.* 291, 339 n.240 (1973) (noting that Washington's interest is in protecting Washington residents).

I also approach this analysis with the understanding that because this case is in federal court pursuant to diversity jurisdiction, we must decide this case as we predict the Washing-

ton state courts would. *See Allstate Ins. Co. v. Hughes*, 358 F.3d 1089, 1094 (9th Cir. 2004).

The majority opinion relies on Professor Chisum's law review article to support its conclusion that Washington's franchisee bill of rights applies outside the state. *See Majority Opinion*, p. 20810. The majority reads Professor Chisum's article as "recommend[ing] only that the legislature define the [territorial] limitation where it already existed in the [Franchise Investment Protection Act] . . . ." *Id*. That reading is not completely accurate. Rather, Professor Chisum specifically suggested that the legislature should do as the California legislature had done and define the term "in this state." Chisum, *State Regulation of Franchising*, 48 *Wash. L. Rev*. at 337-38. That suggestion pertained only to "advertising, soliciting and selling franchises . . ." *Id*. at 337. As to Section 18, Professor Chisum recommended that it "be construed as applying to all franchises *located in Washington* . . . *Id*. at 341 (emphasis added); *see also*, *id*. at 339 n.240 (focusing on Washington residents and not residents of other states). If, as the majority posits, the legislature took its cue from Professor Chisum, there would be no need to further refine the provisions of Section 18 because as the majority noted, Professor Chisum made no recommendation to change Section 18. The lack of a recommendation is understandable in view of Professor Chisum's interpretation limiting the provisions of Chapter 18 to "franchises located in Washington. . . ." *Id*. at 341.

The professor's interpretation is consistent with that of the experienced district court judge, who is considerably more familiar with Washington state law than are we. The district court judge relied on a prior district court opinion, *Taylor v. 1-800-Got-Junk?, LLC*, 632 F. Supp. 2d 1048 (W.D. Wash. 2009). In that case, the district court concluded that "FIPA's legislative history confirms that its language defining conduct 'in this state' was intended to provide a territorial limitation on the scope of the Act. . . ." *Id*. at 1052. The district court's observation encompassed the entire Act and not just certain

portions of the Act. The district court reiterated that the amendment to the Act "demonstrate[d] a clear intent to limit the territorial coverage of the Act to specific conduct that can be said to occur" in the State of Washington. *Id.* As in *Taylor*, the franchisee in this case conducted no business in the state of Washington. Therefore, I would affirm the district court's decision that the Franchise Investment Protection Act was unavailable to franchisee Red Lion Hotels. I dissent from the majority's holding to the contrary.